THE HADJI, etc.

*(District Court, S. D. New York.   June 6, 1883.)*

**1. DEFECTS IN CONSTRUCTION OF VESSEL—LIABILITY OF OWNER.**

The steam-ship H. having water-tanks for ballast in the bottom of her hold, and the plates forming them being insufficiently braced in the original construction, and the rivet-heads in some of the top plates being off, allowing the plates to move up and down, so that in the ordinary course of navigation and motion of the vessel water spurted through the opening seams, injuring the goods aboard, *held*, that the damage arose from defects in the construction and repair of the ship, for which the owners of the vessel were responsible, as for negligence in her proper equipment and repair.

**2. BILL OF LADING—"RISK OF CRAFT OR HULK."**

A clause in the bill of lading excepting "risk of craft or hulk or transhipment," etc., *held*, not to refer to any risk of the hull of the H., but to small craft used in transhipment of the goods from the ship to shore.

**3. SAME—DAMAGE—INSURANCE.**

A clause in the bill of lading providing that "no damage that can be insured against will be paid for," *held*, not to exempt the ship from liability for defects in her construction or equipment, or from negligence of the owners in these respects.

**4. SAME—BENEFIT OF INSURANCE.**

*Also held,* that said clause did not prevent an insurance company which had paid the shipper's loss pending the suit being subrogated to his rights, nor from continuing the suit for the company's benefit; the clause in question not being equivalent to a contract that the carrier should have the benefit of any insurance on the goods.

In Admiralty.

*Sidney Chubb,* for libelants.

*Butler, Stillman & Hubbard,* for claimants.

BROWN, J.   This action was brought to recover $2,500 damages for injuries by water to certain cases of dry goods shipped on board the steam-ship Hadji, bound from New York to St. Thomas, on the twenty-eighth of May, 1880.   The steam-ship Hadji was constructed with water ballast tanks, the tops of which were iron plates forming the floor of the lower hold.   They were secured by iron plates running fore and aft between the plates and the ship's frame.   Over the plates forming the floor of the hold was a permanent planking three inches thick, with a well aft to drain off any water that might get into the hold, and sluices running forward to the engine-room for the same purpose.   The dry goods in question were stowed upon the floor in the lower hold on the port side.   'The vessel, on her voyage, met with no heavy weather.   When the cases were discharged they were found damaged by water that had come into the hold through the leaking of the tops of the ballast tanks.   On examination it was found that some of the rivets in the tops of the tanks had lost their heads, so that the tops would move up and down, and the seams leak; and in the rolling of the ship, through ordinary navigation, jets of water would spurt up and thus wet the goods.   Before leaving New York the floor was dry, and the cargo was dunnaged as usual.

From the vessel's protest on arrival, as well as from the evidence, it must be held that the immediate cause of the damage to the goods was the imperfect and insufficient construction of the ballast tanks themselves.   The supporting plates or frames were insufficient, and additional ones were afterwards provided.

The defense is based upon two exceptions against liability contained in the bill of lading:

(1) It excepts "loss or damage resulting from any of the following perils, whether arising from the negligence, default, or error in judgment of the pilot, master, etc., or otherwise, howsoever, namely: risk of craft or hulk, or transshipment, explosion, heat, etc., collision, stranding, or other perils of the seas," etc., with numerous other items of excepted perils.

It is contended that the words "risk of craft or hulk" refer to the Hadji herself, and exempt the vessel from liability even for her own unseaworthiness, unless it be plainly shown to be the result of the owner's negligence. I am satisfied, however, that the phrase "craft or hulk," here employed, does not refer to the Hadji, but to small boats, lighters, or other craft which may be necessarily used in taking the goods from the vessel to shore, in which the goods are liable to be wrecked or damaged in the passage. To embrace this contingency, says McArthur on Marine Insurance, 29, "the words including 'risk of craft,' or some similar expression, are used" for the protection of the insured against this danger. As this risk of the goods, while in transshipment to shore upon such small craft, is usually included in marine policies of insurance, it was appropriate that the vessel should exempt herself from responsibility for this risk, leaving the owner of the goods to his remedy upon the policy of insurance for this peril, as in cases of other ordinary perils of the seas. This is confirmed by the use of these words in immediate connection with the word "transshipment" in the clause referred to in this bill of lading, and shows, I think, that such was the intention of the parties, and that it had no design to refer to the condition of the Hadji herself, and certainly not to any defects in the construction of the Hadji which would render her unseaworthy for the safe transportation of the goods, or would exempt the carrier from the legal duty of providing a safe, sound, and seaworthy vessel, which is itself an implied condition of all marine insurance.

That the word "hulk" is used in the same sense, and that the whole phrase "risk of craft or hulk or transshipment" refers to the transfer of goods from the ship by other small boats, is further confirmed by another clause which is found at the end of the bill of lading, among other stipulations, to the following effect: "The goods to be discharged from the ship as soon as she is ready to unload into hulk of Lazaretto, or hired lighter if necessary, by the agents of the owners of the vessel, at the shipper's or consignee's risk and expense, after they leave the ship's deck." The latter clause is in effect but a more amplified statement of the exemption of the ship, which the previous clause also would secure. The argument that exemption from the same liability would not be twice provided for in the same bill of lading, and that consequently the words first used, "craft or hulk," must be taken to refer to the Hadji herself, would at best be of doubtful force, while the use of the word "transshipment" in the

first clause, which is clearly covered by the second, shows that this argument does not hold good in this case.

(2) The other clause in the bill of lading, upon which exemption from liability is claimed, provides that "no damage that can be insured against will be paid for."

The goods in this case having been insured by the shippers, the insurance company, during the pendency of this suit, have paid the libelants, and the suit has been continued for the benefit of the insurance company. As against the right of the libelants to recover at the time when the libel was filed, the clause in question afforded no valid defense if the immediate and proximate cause of the damage to the goods was the negligence of the owners or their agents in not making the vessel fit for the voyage in her construction or equipment. Macl. Shipp. 406–410; *Richards* v. *Hansen*, 1 FED. REP. 54. The stipulation, moreover, that "no damage that can be insured against will be paid for," is, in effect, a stipulation against liability. Even under the less rigid decisions of the courts of this state, general words exempting the carrier from liability, however strong, do not exempt him from liability for his own negligence, unless that he stated clearly and explicitly. *Mynard* v. *Syracuse, B. & N. Y. R. Co.* 71 N. Y. 180, 185; *Westcott* v. *Fargo*, 61 N. Y. 542; *Magnin* v. *Dinsmore*, 56 N. Y. 168; *Potter* v. *Sharp*, 24 Hun, 179.

In the United States supreme court, however, in the case of *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 381, 384, it was determined, upon full consideration, that a carrier cannot stipulate for exemption from responsibility for the negligence of himself or his servants. In the prior case of *N. J. Steam Nav. Co.* v. *Merchants' Bank*, 6 How. 344, where the owners of the Lexington had stipulated that Harnden was to be alone responsible for the loss or injury of any articles committed to his care, and that no risk was assumed by or could be attached to the proprietors of the steam-boat, NELSON, J., in delivering the opinion of the court, says:

"We think it would be going further than the intent of the parties, upon any fair and reasonable construction of the agreement, were we to regard it as stipulating for willful misconduct, gross negligence, or want of ordinary care, either in the seaworthiness of the vessel, her proper equipments and furniture, or in her management by the master and hands."

The language last quoted is especially applicable to this case. The damage to the goods on board the Hadji did not arise from any peril of the sea or dangers of navigation; nor, properly considered, from

anything external to the ship herself. It arose exclusively from the insecure and insufficient internal structure or repair of the vessel. The damage was not from sea-water taken in through stress of weather or perils of the voyage, but from the faulty construction of the tanks, whereby the water used as ballast escaped and injured the cargo. The character of the defects, as disclosed by the evidence, shows that they were such as should have been guarded against in the construction of the vessel, or ascertained in her repairs and equipment for the voyage. They were such defects as made her unseaworthy for the safe transportation of goods, and as the immediate and proximate cause of the loss, they were not within the ordinary risks of marine insurance. Arn. Ins. 775; *Copeland* v. *N. E. Marine Ins. Co.* 2 Metc. 432; *Gen. Mut. Ins. Co.* v. *Sherwood*, 14 How. (U. S.) 361. It is impossible, as it seems to me, not to hold that this constitutes in law negligence as respects her seaworthiness and proper equipment for the voyage, for which her owners must be held answerable. CLIFFORD, J., in *Richards* v. *Hansen*, 1 FED. REP. 54, 58, 62.

The clause in question would, therefore, furnish no defense to the libelants' claim for damages in this case, because the injury to the goods must be held to have arisen from the negligence of the owners of the vessel in her faulty and insufficient structure and condition; as much so as if the injury to the goods had been occasioned by one of the bulk-heads falling down and crushing the goods during the voyage through insufficient support. The insurance company, having paid for the damage to the goods, is subrogated to the libelant's right of recovery, and have a right to continue the prosecution of the action for its own benefit. The cases to which reference has been made, where this right of subrogation has been cut off, were determined upon the express provisions of the contract that the carrier should have the benefit of any insurance on the goods in case of loss or damage. *Mercantile Mut. Ins. Co.* v. *Calebs*, 20 N. Y. 173; *Phœnix Ins. Co.* v. *Erie & Western Transp. Co.* reported in Lawson, Carr. 383. See, also, *Taylor* v. *Liverpool, etc., Co.* L. R. 9 Q. B. 546. There is no such express contract in this case, and it cannot be fairly implied from the mere provision that "no damage that can be insured against will be paid for." The very numerous and particular provisions in the bill of lading in this case forbid the supposition that had it been the intention of the parties that the carrier should have the benefit of any insurance, that intention would not have been in-

dicated by some more explicit and appropriate words. *Taylor* v. *Liverpool, etc., Co.* L. R. 9 Q. B. 546, 550.

The libelant is entitled to judgment, with costs. Unless the damage be agreed upon, a reference may be taken to ascertain the amount.